CAROLE ACCESSORIES, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Carole Accessories, Inc. v. Commissioner
Docket Nos. 2155-68 and 3381-70.
United States Tax Court
T.C. Memo 1973-273; 1973 Tax Ct. Memo LEXIS 14; 32 T.C.M. (CCH) 1285; T.C.M. (RIA) 73273; December 11, 1973, Filed. *14 Petitioner was in the costume jewelry business. Its officer-shareholders performed the duties of managers, salesmen and occasionally clerks. "Bonuses" for the officer-shareholders were determined at the end of each year according to the ability of petitioner to pay. During the years in question the bonuses increased substantially. From its incorporation to the period in question petitioner has not paid dividends. Held: a reasonable salary for the officer-shareholders is less than that claimed by petitioner. Held: that part of the bonuses represented distributions of earnings. Charles H. Phillips and Ronald L. Blanc, for the petitioner. Marion Malone, for the respondent. 2 IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent determined the following deficiencies in petitioner's income taxes: Docket No.
Year
Deficiency
2155-68
1964
$22,216.74
1965
28,441.80
3381-70
1966
33,633.60
1967
21,854.55
The deficiencies are based upon respondent's determination in each year that parts of the salaries paid to petitioner's officer-shareholders were unreasonable in amount and that "bonuses paid to the officer-shareholders were actually distributions of earnings. [1] *15 3 FINDINGS OF FACT Some of the facts have been stipulated and they are so found. Carole Accessories, Inc. (hereafter referred to as Carole, petitioner or the corporation) is a California corporation having its principal office in Los Angeles, Calif. Throughout the period 1964 through 1967 it used a calendar year, accrual method of accounting in filing its Federal income tax with the district director of internal revenue, Los Angeles, Calif.
Petitioner has been in the costume jewelry business *16 since its incorporation in February 1959. Prior to its incorporation the business was operated as a partnership by Harold Brooks (Brooks) and Arthur M. Laub (Laub). Brooks had originally founded the enterprise in 1941 or 1942 and Laub had joined him in 1958. In 1959, the year of incorporation, Mr. Norman Goldbach (Goldbach) became the third principal in the business. At the time of incorporation Brooks, Goldbach and Laub were elected as directors and respectively president, vice-president and secretary-treasurer. Prior to joining Carol, Goldbach and Laub had been successful jewelry salesmen with Coro, Inc. (Coro), a large costume jewelry manufacturer and wholesaler. Laub had a total of 15 years' experience in jewelry sales. Goldbach 4 began as a part-time employee with Coro in 1948, and in 1950 he began working full time. While they were salesmen both men became familiar with merchandising practices in the costume jewelry industry. In April 1959 petitioner issued 217 shares of its capital stock and entered a buy-sell agreement with regard to those shares. Brooks and Laub each purchased 100 shares and Goldbach bought 17 shares. Under the agreement the three men each gave *17 Carole and each other a right of first refusal of the shares of any stockholder who desired to sell his stock. Since petitioner's incorporation its stock has been owned as follows: Harold Brooks
Arthur Laub
Norman Goldbach
Jack Levin
Berny Schwartz
Total Outstanding
4-6-59
100
100
17
217
1-28-60
18
235
4-2-61
10
245
4-17-61
35
280
8-14-61
(100)
33-1/3
33-1/3
33-1/3
280
5-23-63
13
293
5-24-63
35
328
9-6-63
13
341
2-18-64
20
361
2-15-65
39
400
9-6-66
10
410
4-19-68
(133-1/3)
27 6-2/3
5-6-68
30
306-2/3
11-12-68
(40)
266-2/3
9-22-70
(133-1/3)
(133-1/3)
0
9-22-70
0
400
400
0
0
800 Petitioner entered a five-year employment contract dated January 1, 1961, with Jack A. Levin (Levin). Levin, like 5 Goldbach and Laub, had consistently been one of Coro's most successful salesmen. His contract was similar to those of Brooks and Goldbach in that it provided for a base salary and for annual review of his work for purposes of paying a "bonus." Shortly after Levin joined petitioner, disagreements regarding buying policy surfaced. Brooks had confidence in the sales ability of Levin, Goldbach and Laub; therefore, as purchaser, he increased the inventory more than the other three men felt was wise. Due to their differences, on August 14, 1961, Brooks sold his *18 Carole stock to Levin, Goldbach and Laub. He also resigned as president and director. The three remaining principals had several immediate problems. They needed to decrease their overstocked inventory without giving the impression that petitioner was in trouble. They had to convince their suppliers and customers that in spite of Brooks' departure Carole would continue in business. Finally, because of Brooks' withdrawal one of the remaining men had to assume the duties of buyer. Yet the experience they had was in sales, not in purchasing. These problems were successfully overcome. Goldbach assumed primary responsibility for purchasing and the other two men assisted. All three men worked diligently to 6 contact suppliers and customers. They were able to decrease their inventory while establishing the continuity of Carole. While working to solve their problems, the three principals retained their administrative and sales responsibilities. Laub became president and assumed primary responsibility for internal management. Goldbach was essentially responsible for production and purchasing. Levin supervised sales, sales promotion and advertising. In 1964 Laub and Goldbach exchanged *19 areas of primary responsibility.
Following the resolution of their immediate problems the three men began the implementation of policies designed to improve sales. They emphasized sales to department stores as well as specialty shops. They often called on customers personally. Furthermore, they developed imaginative merchandising techniques which were quite popular with their customers. Through the efforts of Laub, Levin and Goldbach, petitioner came to be recognized as a trend setter in the merchandising of costume jewelry. Related to the sales program was a plan to make retail purchasers and the public familiar with Carole's name. In prior years petitioner had not followed such a policy. The three principals adopted a company trademark. The trademark and the Carole name were prominently displayed in newspaper advertisements and on tags which were attached to all of petitioner's merchandise. 7 Before the three men had assumed management of petitioner, Carole had merely purchased its merchandise from manufacturers.Laub, Levin and Goldbach began designing some of their own items and contracting for the production of those articles.As designers the trio had several creations which *20 were commercially successful. In their endeavors the three men worked as a team. They functioned not in a conventional first executive, second executive and third executive, but as coordinate proprietors of a small company. In addition to their managerial and sales responsibilities the principals performed work of a clerical nature when necessary. Their hours were long and vacations were practically nonexistent. For the six years prior to Laub's partnership with Brooks, the business had gross sales of about $500,000 for five years and $750,000 for one year. After the incorporation of petitioner, it had vital statistics as follows: Years
Gross Sales
Inventory
Gross Profits
Taxable Income
1959 (9 mos)
$ 982,910
$ 64,487
$252,150
$10,984.11
1960
1,577,040
56,839
401,189
35,185.41
1961
1,878,468
101,914
398,326
8,752.38
1962 1,499,730
62,914
345,289
6,701.00
1963
1,428,198
43,218
362,539
13,713.47
1964
1,504,013
38,300
402,380
23,1 57.88
1965
1,580,266
50,220
444,642
23,864.36
1966
2,089,518
138,210
574,304
39,957.51
1967
2,292,151
110,966
648,640
11,210.97
During 1966 and 1967 Levin had several disagreements with Laub and Goldbach. In 1966 petitioner hired Berny 8 Schwartz, over Levin's objection, as sales manager. In 1967 Laub *21 asserted that Levin's efforts on behalf of Carole were not satisfactory. After acrimonious debate Laub joined Goldbach in voting to decrease Levin's bonus to $5,000 for 1967. On April 18, 1968, Levin resigned as an officer and director of the corporation and terminated his association with it. Six months after Levin's departure Berny Schwartz" employment with petitioner was terminated. During the years in question petitioner adhered to the same method in determining compensation. Carole's employment contracts with its officers provided for base salaries and bonuses. The bonuses were determined at year-end meetings of petitioner's board of directors. The directors did not use a formal system to determine the "bonuses." Instead, each officer-director "blew his own horn," and at the same time evaluated the performances of the other officers. After discussing each other's efforts, the directors would then determine the bonus that each of them should receive based upon what the corporation could afford. Petitioner did not pay dividends on its capital stock from its inception through 1967. A schedule of the total compensation of the officers of Carole for the years 1958 through *22 1967 shows the following: 9 Year
Salary
Bonus
Total
LAUB
1958 (Ptnrshp)
$15,500
$ 6,300
$21,800
1959 (4/1-12/31)
14,170
3,750
17,920
1960
18,460
7,500
25,960
1961
20,260
20,260
1962
19,773
19,773
1963
19,760
11,000
30, 760
1964
20,930
22,000
42,930
1965
24,080
29,000
53,080
1966
25,000
35,000
60,000
1967
25,000
35,000
60,000
GOLDBACH
1959 (4/1-12/31)
$9,000
$2,500
$ 11,500
1960
11,700
4,000
15,700
1961
13,000
13,000
1962
13,008
13,008
1963 13,000
8,000
21,000
1964
17,785
22,000
39,785
1965
22,802
21,000
43,802
1966
25,000
32,000
57,000
1967
25,000
32,000
57,000
LEVIN
1961
$ 13,000
13,000
1962
13,008
13,008
1963
13,000
7,000
20,000
1964
17,875 18,000
35,875
1965
23,625
21,000
44,625
1966
25,000
23,000
48,000
1967
25,000
5,000
30,000
SCHWARTZ
1966 [2]
$13,333.30
$ 6,500
$19,833.30
1967
20,000.00
12,000
32,000.00 10 OPINION A payment is deductible under section 162(a) (1) [3] if it was (1) reasonable in amount and (2) for the services of an employee. Section 1.162-7(a), Income Tax Regs. Respondent supports his partial disallowance of petitioner's deductions on the grounds that the bonuses meet neither of those requirements. Whether a particular salary represents reasonable compensation for *23 services that can be deducted under section 162 is a question of fact to be determined in light of all facts and circumstances. Hoffman Radio Corp. v. Commissioner, 177 F.2d 264 (C.A. 9, 1949). In the statutory notice of deficiency respondent stated that reasonable compensation for the officer-shareholders should be as follows: Name
1964
1965
1966
1967
Laub
33,000
36,300
39,930
43,923
Goldbach
23,100
25,000
27,500
30,250
Levin
22,000
25,000
27,500
30,000
Schwartz
[4]
19,833
21,827 11 Respondent's expert witness prepared a report in which he stated that reasonable compensation for the officer-shareholders should be as follows: Name
1964
1965
1966
1967
Laub
32,640
34,327
34,818
38,117
Goldbach
24,613
27,722
35,261
38,683
Levin
24,230
29,155
28,577
Schwartz
26,402
Respondent now agrees with his expert's higher figures with respect to the compensation of Goldbach, Levin and Schwartz and is willing for the Court to accept those figures. The expert witness suggested that Mr. Laub's compensation should have been less than that allowed in the statutory notice. Respondent states that with respect to Mr. Laub's compensation he *24 is willing to let the larger amounts allowed in the statutory notice stand. In addition to the testimony of his expert witness, respondent bases his determination upon the salary history of the officer-shareholders. Petitioner also presented testimony of an expert witness on the issue of reasonableness. Petitioner's expert witness, Craton, specifically studied petitioner's business and the costume jewelry industry. Craton based his opinion on the compensation practices of petitioner's competitors. He admitted, however, that none of the competitors were comparable to petitioner in both size and organization. Eldridge, respondent's witness, based his testimony on a comparison of Carole's compensation policies with policies 12 of other businesses contained in American Management Association reports and National Industrial Conference Board data. Eldridge's comparison rested upon the assumptions that: (1) base salary was for nonsales efforts and bonuses were for sales; and (2) petitioner's officers operated as a traditional hierarchy. Neither of these assumptions were based on fact. Because both men were experts we value their opinions; however, we shall not rigidly adhere to their *25 guidelines. A reasonable salary is generally assumed to be one which an unrelated employer would pay for the same services in similar circumstances. Hecht v. United States, 54 F.2d 968 (Ct. Cl. 1932), certiorari denied 286 U.S. 560 (1932). Only Schwartz" compensation, and in particular part of his bonus, for 1967 is contested by respondent as unreasonable. During that year Schwartz owned 10 shares out of 410 shares outstanding, and he may have received a distribution because of his shares, as will be discussed below. Because he owned less than three percent of the outstanding stock of a closely-held corporation, however, we believe his situation was more akin to that of an unrelated employee for purposes of determining the reasonableness of his compensation. We note, moreover, that Schwartz was paid $2,479 per month for the eight months he was employed in 1966 and $2,667 per month in 1967. We therefore, find Schwartz" salary to be reasonable 13 for 1967. We are convinced that Laub, Levin and Goldbach were extremely valuable employees to petitioner. They acted as managers, salesmen and, when necessary, clerks. Although there is some question about Levin's efforts in 1967, respondent *26 does not contest Levin's compensation for that year. Aside from 1967, when there is doubt as to Levin's effort, we believe the men worked long hours. In addition, they were men of imagination and creativity. It was due to their imagination that Carole came to be known as a trend setter in merchandising. Their creativity is exemplified by the jewelry which they designed. After Laub, Levin and Goldbach gained control of the corporation, it thrived. Carole's name became known to the public for the first time. Its sales territory was expanded. Most importantly, Carole's sales increased from $500,000 in 1958 to $2,292,151 in 1967. We are troubled, however, by the compensation history of the principals. For the year 1962 Laub received compensation of $19,773 and of that none consisted of "bonus." While we recognize that 1962 was a difficult year for petitioner and there was, as a consequence, less money available for salaries, it is nonetheless true that five years later Laub was paid $60,000 and of that $35,000 consisted of "bonus." Levin and Goldbach had similar compensation histories with 14 the exception of Levin's compensation for 1967. The company prospered during the years *27 in question so it is understandable that compensation increased. We believe, however, that such large increases, consisting primarily of year-end "bonuses," were unreasonable. In determining compensation which is reasonable we considered the dramatic success of the company and the compensation history of the principals as being the two most important considerations. Upon the record we hold that reasonable compensation is as follows: UName
1964
1965
1966
1967
Laub
$39,000
$49,000
$54,000
$57,000
Goldbach
36,785
40,000
51,000
54,000
Levin
33,875
40,625
44,000
30,000 We next turn to the issue of whether the "bonuses" were paid for the services of the officer-shareholders. Respondent contends that the "bonuses" were not for services because they were distributions of earnings. Respondent cites the following elements as being present in the extant case and as characteristic of hidden dividends: (1) the "bonuses" were distributed pro rata to the shareholders; (2) the "bonuses" were decided upon at the end of the business year; (3) since its incorporation Carole has not paid dividends; and (4) the payments were directly based upon the profits of the corporation. Respondent's contention that the bonuses *28 were paid pro rata is not supported by the evidence. For even a rough 15 correlation to exist between officers' compensation and respective stockholdings we must accept respondent's premise that the bonuses of Levin and Schwartz, the managers of sales, should be considered as one. We do not accept that premise. Prudent businessmen will not long pursue an endeavor that yields no return on invested capital. Charles McCandless Tile Service, 422 F.2d 1336 (Ct. C1. 1970). It is, therefore, instructive to consider the dividend history of petitioner. Carole argues that an independent investor would have foregone dividends because the earnings retained by petitioner were needed for expansion. We find that argument incongruous. Petitioner claimed to need money for expansion at a time when it was using its funds to pay large "bonuses." The inconsistency is increased by the fact that a shareholder should not need bonuses as an incentive to the same extent as a nonshareholder. See University Chevrolet Co., 16 T.C. 1452 (1951), affd. 199 F.2d 629 (C.A. 5, 1952). Reliance on the availability of funds in determining "bonuses" lends itself to abuse in a close-corporation situation. [5] The *29 potential for abuse is enhanced by the informal manner in which Carole's bonuses were determined. Where compensation is agreed upon retrospectively, such arrangements "must be given close scrutiny in order to 16 insure that earnings are not distributed under the guise of compensation for services rendered." Klamath Medical Service Bureau, 29 T.C. 339 (1957), affd. 261 F.2d 842 (C.A. 9, 1958), certiorari denied 359 U.S. 966 (1959). Close scrutiny of the extant case convinces us that the "bonuses" consisted partly of dividends. We are not convinced, however, that the full amounts of the bonuses consisted of distributions under section 301. The three principal shareholders, Laub, Levin and Goldbach, owned equal amounts of stock after February 15, 1965, yet in the years in question all three of them never received the same bonus. Therefore, stock ownership could not have been the sole criteria for determining bonuses. We think, however, that it was a factor. Although the principals were understandably reluctant to reiterate past differences, Laub and Goldbach were clearly dissatisfied with Levin's efforts for 1967. Nonetheless, they voted him *30 a $5,000 "bonus." Under those circumstances we believe that the $5,000 was not for services that Levin performed, but because of 133-1/3 shares he owned. Moreover, because Laub and Goldbach each owned the same number of shares as Levin in 1967 we are constrained to hold that $5,000 of each of their bonuses was also a distribution under section 301. Similarly, because Schwartz owned ten shares, $383 of his bonus was dividend. 17 The dividends that we find were distributed for 1967 represent roughly 16 percent of petitioner's taxable income before bonuses. [6] We find that dividends represented the same percentage of taxable income before bonuses for the three years prior to 1967. Accordingly, for the years 1964, 1965 and 1966 $13,625.25, $15,178.30 and $21,833.20, respectively, were paid not for services but as distributions under section 301. [7] *31 Decisions will be entered under Rule 50. [8]
Footnotes
1. The total amounts of the bonuses for the years in question are as follows: 1964
$62,000
1965
71,000
1966
96,500
1967
84,000
In the statutory notices of deficiency respondent stated that petitioner's deductions for compensation were excessive in the amounts as follows: 1964
$40,489.58
1965
55,207.32
1966
70,070.00
1967
52,999.37
Under section 6214(a), I.R.C. 1954↩, "the Tax Court shall have jurisdiction to redetermine the correct amount of the deficiency even if the amount so redetermined is greater than the amount of the deficiency, * * * if claim therefor is asserted by the" respondent. The respondent has not asserted a claim for greater deficiencies. Thus, we do not have jurisdiction to find all the "bonuses" were dividends. 2. Employed May 1, 1966. ↩
3. All statutory references are to the Internal Revenue Code of 1954, as amended. ↩
4. These amounts are in agreement with petitioner's income tax return and were not adjusted by respondent. ↩
5. Nor-Cal Adjusters, T.C. Memo. 1971-200↩. 6. We have used this term for convenience. For the year 1967 Carole had taxable income of $11,210.97 and granted "bonuses" of $84,000, hence its taxable income before bonuses was $95,210.97. ↩
7. It is not without difficulty that we must determine what portion of the purported "bonuses" were in fact disguised dividends. We chose the above method because it has the virtue of determining distributions according to the relative success of petitioner in any given year. 8. For purposes of computing the deficiencies in this case amounts which were determined to be in excess of reasonable compensation are to be treated as section 301 distributions. We have, also, determined that some amounts which were reasonable as compensation were actually section 301 distributions. See Klamath Medical Service Bureau, supra.↩